23735. Good morning. Good morning, Your Honor. Your Honor, as they may have pleased the court, my name is Andrew Obergefell. Speak up a little bit, speak up a little bit. Maybe bring that up. Oh, okay. Perhaps I'll go up a bit. You had differentials today this morning. Yes. Thank you. Is that better, Your Honors? Yes. Thank you. And I apologize. As I was saying, Andrew Obergefell for Obergefell Law LLC on behalf of the appellants William Montgomery and Donald Wood Jr. Your Honors, we would ask that this court reverse the decision of the district court granting the motion to dismiss in this case for two reasons. The first reason is that the district court failed to apply this court's precedent in Mantegas v. Kellogg. And the second reason is because this case does not present the sort of rare situation where the determination of whether a reasonable consumer would be misled can be made as a matter of law. And turning to the first point, Your Honors, in a binding decision of this court in 2018, this court held in Mantegas two important principles of law. The first is that when a consumer is confronted with a misleading representation prominently displayed on the packaging of the product, here the vacuums, that a reasonable consumer is not expected to look beyond that misleading representation to a fine print disclaimer elsewhere on the packaging. But there was no asterisk in Mantegas, was there? There was not an asterisk in Mantegas, Your Honor. And here, really, there is not an asterisk either. There is a dagger, which we suggest creates more of a question of fact. But sticking with Mantegas for a moment, this court later in the Richardson decision, which we acknowledge is a summary order but was decided towards the end of last year, applied Mantegas to an asterisk disclaimer case. In that case, there was a representation on a sunscreen product that the product was reef-friendly with an asterisk. And I think that decision is noteworthy because there, the district court undertook basically the same analysis that the district court undertook in this case. The question in cases like this is, what are we to say is enough? Is it enough to have a little asterisk and then things on the same page? Is it not? Ought people to have a safety that they know that if they do, they're all right? I could come out either way. But on the one hand, consumers have a right not to be confused. And certainly what was said here on its face would seem to be not accurate. On the other hand, people who are selling things have a right to do something which is something which can be an exaggeration and know that they've given enough and not have a whole lot of suits coming out of it. So the question is, where do we draw the line? How do we do this? And go ahead, answer that question. Yes, Your Honor, and I think there's both a factual answer and a legal answer to your question. And I think at this point, the procedural posture matters in terms of the legal issue. And that is that when we're talking about a 12B6 motion to dismiss, we're asking can no reasonable consumer have been misled by this particular labeling? So we have a more deferential standard at the pleading stage. Is that the standard? Under New York's- No reasonable- No reasonable consumer would be misled at the pleading stage to make the determination as a matter of law rather than a summary judgment or a trial. So we're really looking at a reasonable consumer? We're only looking at what a reasonable consumer would understand, exactly. And the lesson, I think, coming out of the combination of Mantikas and Richardson is that where you have, at least at the pleading stage, a misleading representation, which here we contend the peak HP representation was clearly a misleading statement if we're looking at Mantikas and the rest- But should we ask that you do more than bring in your declaration sworn that you were confused or inclined and suggest a more general confusion? Or do we say that that always gets by 12B6 and that's something that then is found at the summary judgment stage where you have to do that? How much do we ask of you? How much do we look at the statement exaggeration? That's my question. I'd like both sides to tell me. Yes, Your Honor. And I think it's helpful in this case to look at the particular representation at issue because fundamentally in any false advertising case, this court will have to look at the label to make the determination and see what's reasonable. However, in this case, we have not only two consumers, in this case, Plaintiff Montgomery and Plaintiff Wood, who purchased the product at two separate times, both of whom considered the statement to mean something that it did not. But not only that, we cited the In Re Shop Vac decision, which was a district court decision concerning the very same labeling on a different manufacturer's vacuum. And they also determined at the pleading stage that a reasonable consumer could conclude that it means the peak horsepower during the actual use of the vacuum. Of course, you agree, and this is a slightly different question from the questions posed by Judge Calabresi, that a court can make this determination as a legal matter. It could in limited circumstances, yes, Your Honor. And here you've said during the argument that this was misleading, and I understand your argument about Mantegas and the framework that is the misleading versus ambiguous framework. But if it is ambiguous, so if we were to disagree with you that the reference to peak HP is misleading and is rather at least ambiguous, to a reasonable consumer, then how do you prevail, if at all? So even if this court were to adopt that framework and decide that peak HP is ambiguous, which obviously we disagree with, but just taking that for the sake of argument, this court still has to then look to the labeling as a whole to determine whether no reasonable consumer would be misled. And looking at this labeling, Your Honors, and on this point, I really do think a picture is worth a thousand words. If you look at the second amended complaint, we have a picture of the packaging and the disclaimer language. And you can very clearly see the peak HP representation in size 72 font in the top left-hand corner of the packaging. And in only size 7 font, buried among other small print language at the bottom of the packaging, is the purported disclaimer that defendant is relying on in this case. And a consumer in a busy retail setting who sees that prominent misrepresentation would not necessarily go to a small fine print disclaimer which is not bolded, not italicized, not marked off in any way. And it's designed apparently to be as- Is this all in the complaint? In other words, does the complaint contain a set of allegations that would support an inference that a reasonable consumer- Other than the fact that it's fine print. Okay, it's fine print. But I think you need a little bit more than an allegation that it's in fine print. Well, the allegation is not merely that it's in fine print. It's that it's also very inconspicuously printed on the packaging such that- Well, yeah, but isn't that a legal conclusion? So where are the- You know, in the same way that you had, I guess, some set of allegations about peak HP and how the two principal plaintiffs thought that that was misleading. Is there a similar allegation with respect to the fine print? So this would be in the second amended complaint beginning at- Paragraph 36 contains the statistics about just the difference between the peak HP representation and the size of the disclaimer. And it shows that the disclaimer is less than an inch tall and less than four inches wide on a package that- So that tells me that it's in fine print, which you can tell. Yes. But that is not- Maybe I'm wrong. I might be wrong. But that doesn't seem to be enough. So we have actually, as you know, and other courts have determined that notwithstanding the fact that the disclaimer is in fine print, it still is not something that we would say would confuse a reasonable consumer. So what is it in your complaint that I can turn to to say that this fine print is not enough to resolve the ambiguity with respect to peak HP? In terms of the allegations in the complaint, they do center on the size differential and the placement of the disclaimer. But we would note that in much of the case law in this circuit, courts have held that where there cannot be a finding that no reasonable consumer could be misled given the context of the package. Does it matter that the statement is so far away from what is the actual event and that the explanation is not a very good explanation? It doesn't tell you the amount that it will do. It will say, well, it's not the same. Does that matter in terms of whether this is adequate? It is. It's not just a matter of the fine print, but does it- I don't know. Does it matter how exaggerated, let's say, the statement is and how unclear the explanation is? Both of those things matter, Your Honor. Both the placement and the substance of the explanation both matter. And in this case, we would just note that the main representation which the consumer would see in very bold print is completely displaced on the packaging from where the disclaimer is located. And we think that that appears pretty clearly in paragraph 36 of the complaint. And, you know, to the extent this court finds that the actual substance of the disclaimer language does not apprise a reasonable consumer as to the functionality of the vacuum, that would be relevant as well. And I see- But doesn't that get us in the problem that then every case is an individual case and must be decided individually and that we have no broader guidelines for people to do? Well, I would argue that the combination of this court's decision in Mantikis and Richardson do provide a legal framework for making this determination at the pleading stage. However, in any false advertising case, the context of the particular label will have to be examined on its own. So this was also – I mean, this meaning more broadly speaking this issue was the subject of a separate litigation at a very broad level. And what your friends on the other side argue is we're using – we're simply using the same disclaimer that's been blessed, to use that word, by a court. What is your response to that? Yes, Your Honor, and I consider that argument a bit of a red herring because the issue in this case primarily is not so much the substance of what the disclaimer actually says. It's how they placed the disclaimer. And that settlement agreement in the In re Shop Back case- Okay. So you don't have a problem with the substance of the disclaimer? That's not our position, Your Honor. It's just the placement? Yes. I want to just clarify that. Well, I think you've reserved some time for rebuttal, three minutes. So we'll hear from your friends on the other side. Thank you. Good morning, Your Honor. And thank you, John Cerretta, for Stanley Black and Decker with my colleague Michael Shortensee. We would ask the court to affirm, we think the district court got it right, that the claim peak HP with a dagger is at most ambiguous. And it is resolved by following that dagger to the judicially vetted clarifying language elsewhere on the package. That makes very clear what peak HP- When you say judicially vetted, did that other litigation tell manufacturers and the boxers, I guess, where to place the disclaimer? No, it did not. The settlement there was about the language. And there are provisions. It's at DA 14 of our appendix that the plaintiff's counsel had auditing rights to look at the packaging. But, no, I agree. The question of placement and font size, that's not what we're saying is vetted. What we're talking about there is the language. So let me get to that placement font size issue. Because I do think the framework here is peak HP on its face, as Judge Dooley said, that's not clear. Peak, it's not clear what peak is measuring. It's not clear even what the initials HP means. Let us suppose that we rule against you on 12B6. And we get, not to a jury, but to the possibility of summary judgment. And at that point, the other side brings in a swatch of people. All of whom say, we look at this and we think it will do that. Isn't that relevant? Shouldn't we know if that is so? That is, more than just this person or these two people saying they are confused. But that what is going on here is sufficiently confusing so that it isn't an adequate explanation. Isn't that something that there is enough about this that we should find out? I don't think so, Your Honor. That's true in every case. There always could be evidence about consumer surveys and the like at summary judgment. But what this court said in Fink and what it has said in three summary orders, at least in the last few months, affirming 12B6 dismissals, is that you can make judgments as a matter of law at the pleading stage. Well, you can in some cases. This is my problem. I'd like to be able to say it's on one side or the other. On the other hand, we do have Metsikas, we do have a summary order after that. And on the other side, we do have Fink, and we do have all those. And I'm trying to figure out where this case stands in terms of 12B6s against summary judgment in the middle of those cases. And also to try to do it in a way that we don't get every case coming to court. Sure. Well, let me try to convince you why this is on the affirmance and 12B6 dismissal side of that line. So I think it is ambiguous, and it has a very prominent dagger symbol. Now, I know it's in fine print elsewhere on the label, but the dagger symbol is undeniably prominent. Another confounding factor here, I think, for the other side is we are not talking about what we're often talking about in these cases, tortillas, Purell hand sanitizer, sunscreen. This is a wet-dry vacuum. There's a good case on this point from the Ninth Circuit cited in the briefs about kind of designer she-she honey that's like $30 a bottle. What? Designer sort of fancy honey at Trader Joe's. Fancy honey at Trader Joe's that's $30 a bottle. And the court makes the point that this isn't, you know, the harried parent in the dairy aisle buying the Parmesan cheese. This is some fancy honey from New Zealand from the Manuka nectar that's $30 a bottle. Well, all the more so for a wet-dry vacuum where the allegation is that this is a, you know, this is a consumer appliance significantly more expensive than even the fancy honey. And the person in the aisle sees peak HP with the dagger, thinks, and we understand, take as true the allegation that thinks that means operating horsepower of the vacuum in everyday use, even though, as the complaint alleges. Just let me say to the side, you say the dagger is very clear. Now, my eyesight is still pretty good, and I could see the dagger. You could have made a much bigger dagger or a big asterisk or something. It's not exactly a dagger that says, look, look, look. It's there. It's there. And I could see it. My wife, whose eyesight is not as good, probably could not, but that's her problem. So what I would say to that, Judge Calabresi, is the allegation here is right, that the peak HP, 5.0 or 5.5 peak HP, is the basis of the purchase decision. And there is the dagger. So I think a person who's making judgments based on that is going to follow. Why put the 5.0 number there at all? So I actually saw downstairs in our basement a wet-dry vacuum that had 6.0. I don't even know what that means exactly. And it didn't have a dagger. It just had 6.0. No disclaimer so far as I could tell, but it was not the packaging. It was the actual thing. Why put 5.0 there? Why put 5.0 on the wet-dry vacuum itself? On the packaging, yes. On the packaging. As the disclaimer, the judicially blessed embedded clarifying language makes clear, it's a long-time consumer comparison term used in the industry, and it is accurate. It is what the horsepower that the motor achieves in the laboratory. Now, it's true that, as the complaint alleges at the appendix at 11 to 12, that, you know, American three-pronged outlets are going to blow a fuse, and they're not going to achieve that laboratory test. But it is an accurate claim for consumer comparison purposes. Why would people care at all what happens in the laboratory? I mean, if I'm buying a vacuum cleaner, which fortunately I don't do, it's my wife that does, if I were buying it, I wouldn't care at all what happens in the laboratory. Maybe that's because I'm dense, but, you know, I'd leave that to scientists. So I think the basic point, Your Honor, is that it's a useful consumer comparison term used throughout the industry. You can look and say, okay, here's the 6.0. Here's the 5.0. And if you follow the dagger to the clarifying language, it makes very clear what that means. Do you know, and I don't know the answer to this, and it's not a complaint, but just educate me a little bit. Because I didn't see the package. You guys just saw the thing itself, the product. Is when I go to buy a wet and dry vacuum at Home Depot or Lowe's or wherever, and I see different categories, different companies, different manufacturers, do they all have this disclaimer, or do they all use the 5.0 or 6.0 or 4.0 number in the same way? Yeah, so I don't want to speak too much outside the record, but I'll say it has been widely adopted, and I think based on the record we can say that here. The Shopvac MDL settlement, one of those, so these are Craftsman brand wet-dry vacs manufactured under a license from Stanley Black & Dechter, one by the former Shopvac Corporation implementing the MDL settlement, the other by Cleveham, which was purchased by plaintiff Wood at a Sears on Long Island. And they adopted, basically the industry sort of followed the class action settlement and largely adopted the dagger footnote approach. Just a couple other points, subject, of course, to your Honor's questions. Yeah, so with respect to this other litigation, I just want to make sure that I understand that it did not say anything about the placement. It did not. I mean, I think what the, and we're not making any sort of preclusion argument or anything. What we are saying, though, and I do think it's a useful point for us, is that it's very unusual. The Richardson case cited by the other side is a case where, it's a summary order, but the court said that disclaimer doesn't really disclaim. That clarifying language isn't all that clarifying because it's not even talking about these other four things that are in the sunscreen that are harmful to reefs. Well, I don't think you can say that here because this was vetted. It was approved by the district court over objections. And it is very clear in terms of its language. Now, there is an issue. There's no dispute about the accuracy of the language. Absolutely. And the font. And what I'll say about that is it's small font. It is. There was one, I think it's probably like 12-point font or 11 on Plaintiff Woods, 7-point font on Plaintiff Montgomery's. But, you know, and the point is, well, you have the 72-point PKHP. That's awful small in comparison. But if this were another product, it's not all that small. For example, federal guidance on ingredients, for example, are that it has to be at least 1-16th of an inch. It's about 6-point font. So it's not, you know, it's legible. It's readable. And you can follow it. Isn't there federal guidance in roughly this area that requires larger font than 7-point font? In some contexts, there is federal guidance that would require larger than 7. What I'm saying is there's no federal guidance about this particular product, this particular thing. This is a normal sort of font size for the small fine print, and it's legible. And it's indeed just as big, if not bigger, than some of the clarifying language that the court has seen. Just in answer to Judge Calabresi's questions, you know, reasonable consumer, I appreciate that we have repeatedly made these determinations as a matter of law about what a reasonable consumer, whether a reasonable consumer would view something as ambiguous or misleading and so on. But what's the deficiency here in the complaint with respect to what a reasonable consumer or how a reasonable consumer might view the fine print? Well, I do think that it's fine for them to allege that this is how they read it. And then I think what the court's cases teach is that this court has to make conclusions as a matter of law about what a reasonable consumer would do. How do we deal with that? I think you look at the full package. That's what the thing says. Look at the full package. Look at the type of product. All the information about it, that it's not just a normal, you know, grocery store item, but a significantly more expensive item. You look at all of it in context, and if a reasonable consumer would not be misled, make a judgment as a matter of law. Just one other point before I sit down on that is that, you know, it's true that it's at some remove, as my colleague said, from the dagger, but it's a large, sizable dagger, and it's right where you would expect to find clarifying language. And when you make this something we do as a matter of law, in a way you're saying you can be reasonable consumers. You can judge what the reasonable consumer does. And I'm sure that Judge Cabranes is a reasonable consumer, but I'm not sure about either Judge Lohier or myself. Speak for yourself. Well, I appreciate the question, Judge Calabresi, and I certainly understand it. That is to say, there are, you know, we're only talking about a 12B6 and what goes through to discovery, and I do get that. But that is sort of the judicial craft, you know? Fourth Amendment cases, lots of things are fact pattern 1,300, and does this meet a legal standard? And we'd ask the court to do that here and affirm. Thank you very much. Thank you. I mean, it does appear that we get to in summary orders and think we seem to be prepared to determine what a reasonable consumer might view fine print, for example. So we can do that. I think you've already acknowledged that. This court could make the determination as a matter of law, but only in the context at the 12B6 stage, if this court were to find that no reasonable consumer as a matter of law could be misled by this label. And in terms of the rebuttal time, Your Honor, I would just like to get to brass tacks on the actual label here. And again, this is at paragraph 36 of the second amended complaint. And as Judge Calabresi mentioned, you know, what does a reasonable consumer expect when they're looking at an advertising or piece of representation on an advertisement, 5.0 peak HP? The consumer is thinking about what's it going to do for me. They're not thinking about what's going to happen in a laboratory, what's going to happen in some other setting that is not applicable to their actual use of the product. They're advertising this to be used in American homes by real people. And my adversary has acknowledged that that representation, they acknowledge that is incorrect and that is not what the vacuum does. And for a consumer to see that in prominent print creates a misleading statement on the face of the advertising. And this is what this court was getting at in Mantecas. When a consumer is confronted with a misleading statement such as that, at least at the pleading stage, this court looks no further, certainly not, to fine print disclaimers on the bottom of the packaging. And, Your Honors, this is not even the only disclaimer on the packaging. There's an asterisk, there's a dagger. It's not clear what any of it means. But my problem, just to go back to my questions to you, not my problem but the question, is in your complaint, what you do, and it seems to me that all you do is tell us that it is in fine print. And that's – I think you need to say more, to allege more, unless you want us to make our own determination without an allegation, without a further allegation about its fine print and a reasonable consumer, no reasonable consumer would be able to see the fine print because of the placement, because it's too small. Well, I think the fundamental legal argument would be, as far as Mantecas is concerned, that if this court should find that the 5.0 peak HP representation is misleading to a reasonable consumer, which it doesn't even appear there is an argument about that, then Mantecas would say, stop reading. Why? Mantecas explained – Well, there is an argument about whether it's misleading. They say it's ambiguous. At worst, you say it's misleading. It is misleading, Your Honor, and I would just say that the misleading versus ambiguous framework is not a framework that's been adopted by this court. The only binding decision on this subject is Mantecas. And, in fact, if you were to apply a sort of misleading versus ambiguous framework, not only is it difficult to apply, but if I may, just consider the facts of Mantecas, right, the decision itself. There, it was a box of Cheez-Its, and it said whole grain. That was the representation on the front of the packaging in Mantecas. That doesn't – and, in fact, that was technically correct. The product did have whole grain, and there's another packaging that said eight grams of whole grain. So the package was technically correct. However, this court still found that that was a misleading representation because it was reasonable for the plaintiffs to allege that the product was predominantly whole grain based on that representation. So this sort of dichotomy between affirmatively false and misleading doesn't really square with this court's published precedent. Instead, the better rule is where you have a representation like this that is incorrect, that does not achieve what it says it's going to achieve, Mantecas would say at the pleading stage, this court should not credit the disclaimer and allow the jury or the court to make the determination of summary judgment. Just as a follow-up to a question that was posed, let's say that we agree with you, and this does go, I guess, to summary judgment. What does summary judgment look like? Well, there would certainly be a more developed record both in terms of – What are you developing? Well, there could be expert analysis in terms of consumer understanding surveys. So surveys, is that what you would have? It could be things of that nature that would give the court a more broad-based view of – So surveys of consumer confusion. It could be, Your Honor, whether understanding of the label, things of that nature. And we would also have a more developed record factually as to what the plaintiffs saw and understood, and this court – and Richardson recognizes this, Your Honor. If you look at the Richardson decision, it states, yes, at the pleading stage, re-friendly is not sufficient to overcome a motion to dismiss, or is not sufficient to allow dismissal, but the court can take up the subject at summary judgment or trial. So this is a relatively well-worn notion that at the pleading stage, it is a more deferential standard as opposed to – No doubt, no doubt. I'm just trying to understand. I'm kind of curious. Let's say we were at summary judgment, and you come in with a fair number of people who were confused. You know, you do a survey, and the other side comes in with cases where we have said it was enough, and they come in, but in those cases, a fair number of people say they were confused as well. And then where are we? That is, in cases we have said that's okay, a fair number of people are shown to be confused, and you show the same – about the same number are confused here. What does that then tell us? I think the data – and it's hard to know what – That the other cases are wrong, or that we should follow what the other cases did? Well, I think this court would then apply the reasonable consumer test based on the facts that were developed as part of fact discovery and expert discovery. Thank you. Yes, thank you. Thank you very much. Very helpful. We'll reserve the session.